

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6733 | **DATE** | 11/1/2004 |
| **CASE TITLE** | ROBERTS vs. NAPERVILLE COMM. UNIT SCHOOL. DIST. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Deft. Motion for Summary Judgment (doc. #34)
> Plaintiff's Motions to Strike (docs. #40,42)
> Deft. Motions to Strike (docs. #44, 48)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Summary Judgment (doc. #34) is GRANTED. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment (doc. #40) is DENIED. Plaintiff's and Defendant's Motions to Strike Exhibits and Statements of Facts (doc. #42, 44, 48) are GRANTED in part and DENIED in part as set forth in the Memorandum Opinion and Order. All pending dates and motions are terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | NOV 0 2 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 49 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 2004 NOV -1 PH 5:48 | | |
| JHC | courtroom deputy's initials | FILED-501 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PREDONNA ROBERTS,                    )
                                     )
        Plaintiff,                   )
                                     )        Nos.   02 C 6733
        v.                           )
                                     )
                                     )        The Honorable William J. Hibbler
NAPERVILLE COMMUNITY UNIT            )
SCHOOL DISTRICT 233,                 )
                                     )
        Defendant.                   )

DOCKETED

NOV 0 2 2004

## MEMORANDUM OPINION AND ORDER

Predonna Roberts believed that the Naperville Community Unit School District unfairly fired

her from her position as the principal of Madison Junior High School. Roberts sued the District,

alleging that it fired her because of her race and gender in violation of 42 U.S.C. § 2000e, in

retaliation for her opposition to racial discrimination in violation of 42 U.S.C. § 2000e, and without

giving her due process in violation of 42 U.S.C. § 1983. The District moves for summary judgment.

### I. Factual Background

Both parties move to strike portions of the other's statement of facts. And both parties

throughout their statements of fact frequently fail to direct the court to the appropriate portion of the

record or to the deposition testimony of a witness with personal knowledge of the subject matter or

the parties cite to material that simply is not relevant, all of which are improper. *See Greer v. Board*

*of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7 th Cir.2001); *Eisenstadt v. Centel Corp.*, 113

F.3d 738, 742 (7th Cir.1997); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir.1994); *Fed.*

*Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir.1986).

1

Defendants' facts are riddled with statements of fact that rely upon matters outside the personal knowledge of the deponent or that simply are not relevant. For example, Defendant attempts to show that Roberts did not know the names of her staff members by citing to the deposition testimony of Patrice Olinger and Jacqueline Plourde. (Def. 56.1(a) Statement ¶¶ 64-65). Olinger testified that "People talked about her not knowing their name." Plourde testified that Roberts did not know Marie Higgins' name because Higgins "told us" and that she "believe[d]" that Ellen Rathunde also told her that Roberts did not know her name. None of these statements is based on the witness' personal knowledge. In another statement, Defendant points to facts suggesting that Kathryn Houk, a teacher at Madison, felt that Roberts was not a good principal. (Def. 56.1(a) Statement ¶¶ 78, 81, 85). But Houk was not a decisionmaker, nor does Defendant point to any evidence that Houk communicated her concern to Bryan, the primary decisionmaker for the Defendant. Defendant does not suggest that Houk, because of her teaching experience, is an expert competent to testify on the characteristics of a good principal. Houk's opinion is simply a naked opinion, lacking any relevance to the issues at hand. To the extent that Defendant's statement of facts relies upon irrelevant testimony or upon testimony that is not based on the personal knowledge of the witness, those statements will be disregarded.

Plaintiff's statement of facts, on the other hand, frequently fails to point the Court to the specific part of the record where the disputed fact can be found. For example, Paragraphs 55, 68, 70, 80, 87, 91, 98, 102, and 122 of Roberts' 56.1(b)(3)(b) Statement and Paragraphs 133, 136, 138, and 161 of her 56.1(b)(3)(a) Statement fail to direct the Court to any specific portion of the record to support the statement. These paragraphs therefore are stricken. Roberts also repeatedly denies facts from the Defendant, but points to evidence that in no way refutes the contested fact. For

2

example, Roberts consistently points to the fact that no grievances were filed against her to dispute Defendant's proffered facts regarding complaints about Roberts' performance. But grievances are but one of many ways faculty may have complained about Roberts. Paragraphs 51, 55, 61, 86, 87, 98, and 99 of Roberts' 56.1(b)(3)(A) Statement are also stricken (and the corresponding paragraphs of Defendant's 56.1(a) Statement are therefore admitted). Except as otherwise noted here, the Plaintiff's and Defendant's motions to strike are denied.

Prior to the start of the 1999-2000 school year, the District interviewed several candidates to assume the vacant principal position at Madison Junior High School. (Bryan Dep. at 6-7). The District put together an interview committee consisting of parents, teachers, and administrators (including the outgoing principal, Jerry Virgo, and the Assistant Superintendent for Human Resources, Dr. Michael Kiser). (Bryan Dep. at 6-7). Dr. Kiser and Russ Bryan, the Associate Superintendent responsible for supervising Madison, eventually recommended to the School Board that it hire Roberts for the position at Madison. (Def. 56.1(a) Statement ¶ 26). The Board accepted the recommendation and the District hired Roberts, an African American female, as the principal of Madison Junior High School for the 1999-2000 school year. (Def. 56.1(a) Statement ¶¶ 1, 7, 28).

In October 1999, Roberts held a meeting with Madison's school counselors to discuss the school's approach to dealing with at-risk students. (Roberts Dep. at 69-74). According to Roberts, the counselors disagreed with her suggested plan and shortly thereafter "started a campaign" against her. (Roberts Dep. at 71-74). Roberts suspected that Sally Pentecost, the assistant principal and also an applicant for the principal position filled by Roberts, was upset that she was not hired as principal and encouraged the counselors loyal to her to sow the seeds of dissension within the school. (Roberts Dep. at 68; Davenport Dep. at 33; Olinger Dep. at 17-18).

3

Shortly after the October meeting with the counselors, problems began to surface at Madison. First, Madison teacher Carol Vermaat[1] complained to Russ Bryan that Roberts had yelled at her in a hallway and social worker Jennifer Madson complained that Roberts had confronted her in the presence of other Madison faculty. (Bryan Dep. at 22-24). Bryan felt these complaints were unusual because never before had he received a complaint from a teacher about an administrator (Def. 56.1(a) Statement ¶ 40). Shortly after Vermaat and Madson complained to Bryan about Roberts, Bryan received an anonymous letter complaining about Roberts. (Def. 56.1(a) Statement ¶ 42). The anonymous author complained that Roberts: 1) was not knowledgeable about the staff or school procedures;[2] 2) was not available to the staff; 3) blamed others when problems arose; 4) was in "control mode"; 5) did not accept input from staff; and 6) yelled at employees. (Def. 56.1(a)

---

[1] Several of the teachers and employees of the District relevant to this litigation have changed their names since the time of Roberts' tenure as principal. In all cases, the Court refers to the employees by their current name.

[2] Roberts admits that she did not know everyone's name at the beginning of the school year, but testified that she did know them by the middle of the year. (Robert's Dep. at 149). The Defendant denies Roberts' 56.1(b) Statement ¶ 23, claiming that 1) it represents a self-serving opinion; and 2) it is not material. But Defendant has an entire section of its statement of facts devoted to an attempt to prove that Roberts did not know the names of all faculty and staff at Madison, and thus if Roberts' statement is not material, neither are Defendant's. Second, testimony given by parties in depositions is almost always self-serving. Much of Bryan's testimony, offered by Defendant, is also self-serving. Nothing in the Federal or Local Rules prevents a party from relying on self-serving testimony. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (self-serving affidavit acceptable method for providing evidence on summary judgment provided it is based on personal knowledge). Roberts' testimony is based on personal knowledge — she knew whether she knew the names of Madison personnel. Because Defendant's denial is improper the Court deems Plaintiff's 56.1(b)(3)(B) Statement ¶ 23 to have been admitted. Further, the fact that Defendant's have presented testimony of other witnesses who stated that Roberts did not know every staff member's name is of no import because on summary judgment the Court must examine the facts in the light most favorable to the non-moving party. Contrary to Defendant's representation, this is a contested fact and the Court must accept as true Plaintiff's contention that she knew everyone's names.

Statement ¶ 43). Bryan showed Roberts the letter and explained that he did not "know where it was coming from" but that Roberts "need[ed] to be aware that somebody has these feelings." (Bryan Dep. at 35).

Because of the letter and the complaints that Bryan received, he began to visit Madison in November 1999 to observe the atmosphere at Madison. (Def. Ex. J at 142). Bryan also met with the school social worker and guidance counselors, who reported that there was a low level of trust between Roberts and the staff. (Bryan Dep. at 41). At the same time, Roberts expressed to Bryan that she believed that the counselors loyal to Pentecost continued the campaign against her by keeping "issues" that they had with her alive. (Bryan Dep. at 38-39). And although Bryan talked with Roberts about the staff members' concerns and the ways in which she could improve the climate at Madison and her relationships with staff, he never investigated Roberts' suspicion that staff members rebelled against her purposefully and in support of Pentecost's unspoken "claim" to the principal's position. (Bryan Dep. at 38-41; Def. 56.1(a) Statement ¶ 52). Throughout December, Madison's union representatives (Vermaat and Jacqueline Plourde who represented the 66 certified personnel at Madison) continued to bring concerns to Bryan similar to those voiced in the anonymous letter. (Def. Ex. J at 142). Bryan met with Roberts four times in December 1999 to discuss ways in which she could improve her relationships with her staff. (Def. 56.1(a) Statement ¶ 52). Later in December, Bryan expressed concern to the school board about Roberts' performance, noting her interaction with the staff. (Def. 56.1(a) Statement ¶ 53).

On January 18, 2000, Bryan met with Roberts for her mid-year review. (Def. 56.1(a) Statement ¶ 56). The day after the review, Bryan sent Roberts a written memorandum discussing her performance. (Def. Ex. J. at 145). That memorandum reads, in full:

5

At your mid-year conference on January 18, I reviewed my concerns over the current issues of low staff morale and the low level of trust that has developed between you and the staff at Madison. I have discussed the need for you to focus your attention on using interpersonal skills, which are necessary to establish positive working relationships with staff. I believe that the trust and morale issues are a direct result of not establishing a collaborative relationship with staff. Your attention to this matter will hopefully lead to a new level of trust, respect, and staff confidence in your leadership style.

At this point in the year the issues are continuing to increase in magnitude rather than improve. I believe that many staff are withdrawing into their classrooms as a method of coping with their perceived inability to share information about the atmosphere in the building. I have encouraged staff members to meet with you to share their concerns. If this dialog occurs, I believe it can be helpful in creating a collaborative relationship with staff.

As discussed, I will continue to closely monitor progress in the areas of staff morale, trust, respect and positive working relationships. If significant progress toward improvement in these areas has not been made by March 1, 2000, I will not be able to recommend you for continued employment as principal at Madison Junior High School.

I appreciate your shared concern over the issues that have developed over the first half of this year. I truly believe you are committed to working to resolve the problems. It is my sincere hope that you will be able to establish the necessary staff relationships to lead Madison in a positive direction.

Roberts responded to Bryan's memorandum a few weeks later, expressing her concern that Bryan's memorandum focused only on the negative areas of her performance and excluded any discussion of areas in which Bryan praised her job performance. (Roberts Aff., Ex. B). Roberts repeated to Bryan her feeling that certain staff loyal to Pentecost launched a "smear campaign" against her and pleaded for support from the District to help quell the unrest. (Roberts Aff., Ex. B). At some point during her tenure as principal, Roberts also asked the Board to provide a statement to the staff in support of her leadership, but they did not. (Roberts Dep. at 208). Neither the Board nor Bryan ever convened a meeting to announce their support for Roberts as principal, though Bryan continued to meet with Roberts on a weekly basis through March 2000. (Def. Ex. J. at 80, 145).

But Roberts' problems continued to grow. Bryan was frequently called to the school to deal with complaints regarding Roberts. (Bryan Dep. at 72). Vermaat and Plourde, Madison's union representatives, both continued to complain to Bryan about Roberts. (Bryan Dep. at 72). Patrice Olinger, a teacher at Madison, wrote letters to the school board complaining about Roberts, but failed to mention any specific events that formed the basis of her complaints. (Olinger Dep. at 55-56, 59-60).

On March 10, 2000, Bryan composed a memorandum to Roberts regarding her employment recommendation for the 2000-2001 school year. (Def. Ex. J. at 79). Bryan informed Roberts that, although she had made an effort to improve her relationships with school personnel, he did not "feel satisfactory progress ha[d] been made in order for me to recommend reemployment as the principal at Madison Junior High School for the 2000-2001 school year." (Def. Ex. J. at 79). Bryan informed Roberts that: 1) she had not developed effective leadership strategies and that staff members were uncomfortable approaching her to discuss problems; 2) staff morale was low; and 3) staff members did not respect her as a leader. (Def. Ex. J. at 79). Bryan further stated his belief that the issues he had identified could not be improved to the level necessary to lead the staff in the future and that he would recommend to the board that she be dismissed as principal of Madison. (Def. Ex. J. at 79). At this point, Bryan had met with Roberts or Madison staff members 35 times in an effort to improve the climate at Madison. (Def. Ex. J. at 143).

On March 16, 2000, Roberts met with school board member Osie Davenport, Bryan, and Superintendent Donald Weber. (Def. 56.1(a) Statement ¶ 100). At the meeting, Bryan discussed the concerns about Roberts and her relationship with the staff at Madison. (Def. 56.1(a) Statement ¶¶ 102, 107). Roberts expressed her concern to Davenport, Bryan, and Weber that many of the

7

criticisms that had been directed at her by the staff had been done because she was African American. (Davenport Dep. at 51). Roberts also suggested the District support some team-building training and look into hiring a conflict resolution consultant. (Roberts Dep. at 180-81). Roberts requested that Bryan and Weber reconsider the decision not to renew her contract and give her an additional year to resolve the problems at Madison. (Roberts Dep. at 125). Davenport recognized that the Board had put Roberts in a difficult position because of the faculty who were loyal to Pentecost. (Davenport Dep. at 39-40, 102-103). At the end of the meeting, Weber and Bryan agreed to withdraw the recommendation to dismiss Roberts at the end of the current school year. (Def. Ex. J. at 143).

Shortly after the Board met, Bryan asked Roberts to draft a plan for the 2000-2001 school year that would address the areas of improvement he noted in his March 10 memorandum. (Def. Ex. J. at 143). Roberts drafted a plan identifying specific tasks for herself, Bryan, and the District to improve her leadership skills, the relationships between principal and staff, and staff morale. (Roberts Dep. at Exs. D & E). And again, Roberts requested that Bryan provide a written and verbal statement of support to help quell the tensions at Madison. (Roberts Dep, Exs. D & E). In addition to Roberts' plan, Bryan prepared a summary report of the problems at Madison for the Board on April 3, 2000, in which he noted that Roberts' problems "centered around ineffective leadership strategies for establishing relationships" and "ineffective communication." (Bryan Dep. at 27).

On June 6, 2000, Bryan submitted his final review of Roberts' 1999-2000 performance. (Def. 56.1(a) Statement ¶ 115). The review contained 11 "accountability" areas in which Bryan assessed Roberts' performance on a scale of 1-6 with 6 being the highest rating. (Def. 56.1(a) Statement ¶ 116; Roberts Dep. at Ex. C). In every area but "Accountability 7," Bryan assessed

8

Roberts' performance at a 3. (Def. 56.1(a) Statement ¶ 119). But in "Accountability 7," where Roberts was assessed based upon her ability to "[d]evelop and maintain open lines of communication with students, staff and other district personnel," Bryan gave Roberts a score of 1 and wrote that:

> Although [Roberts] was involved in a number of activities designed to develop and maintain an open line of communication with staff, I expressed concern throughout the year about the need to improve working relationships through effective communication. This concern was noted in memos dated January 19, 2000 and March 10, 2000. This accountability must be a focus for the 2000-2001 school year and significant improvement in [Roberts'] relationship with the staff must occur. The information collected and summarized by Mr. Tom Cavenagh, [sic] further indicates a similar need. It is my hope that the relationship and communication issues can be resolved before the start of the 2000-2001 school year.

(Roberts Dep. at Ex. C).

Near the end of the 1999-2000 school year, the Board acted on Roberts' suggestion from the March 2000 meeting and hired Thomas Cavenagh, the director of the Dispute Resolution Center at North Central College in Naperville, to play a neutral, mediative role, to assess the situation at Madison, to recommend a program to resolve the conflicts, and to work with Roberts and the staff to improve the climate at Madison. (Def. 56.1(a) Statement ¶¶ 120-122). Cavenagh met with Bryan and Roberts to discuss his approach and the mediative process. (Cavenagh Dep. at 14-15). Cavenagh then spent the next three weeks at the school meeting with Bryan, Roberts, and each and every paid staff member (including janitorial staff, kitchen staff, secretarial staff, administrative staff, faculty, and parent representatives) at Madison. (Cavenagh Dep. at 15-16). Cavenagh observed at the outset that there was significant tension at Madison and that a significant number of personnel, from all areas of the school, had difficulties working with Roberts. (Cavenagh Dep. at 17-20). In particular, Cavenagh observed that "virtually all" faculty believed that Roberts was not responsive to their needs and that when they asked about her nonresponsiveness she blamed someone other than

herself. (Cavenagh Dep. at 23-24). Cavenagh also noticed faculty complaints about Roberts' professionalism. (Cavenagh Dep. at 23). Cavenagh believed that the tension at Madison made it difficult for the staff to excel at their jobs. (Cavenagh Dep. at 41). At the same time, Cavenagh acknowledged that the transition to a new principal, particularly since Pentecost had also applied for the position, made for a difficult situation at Madison. (Cavenagh Dep. at 40).

Around June 5, 2000, Cavenagh prepared a memorandum that identified five issues that needed to be resolved at Madison and also identified a variety of strategies to address those issues. (Cavenagh Dep. at 61; Def. Ex. J. at 107-110). Among other things, Cavenagh expressed his opinion that the District had an "ongoing" need to evaluate the administration at Madison and that the Associate Superintendent (Bryan) should design and implement a formal evaluation process that allowed staff to contribute feedback in the evaluation of Roberts and Madison's assistant principals. (Def. Ex. J. at 110).

Early the following school year, Roberts' problems boiled over. In November 2000, Madison prepared a school newsletter for public distribution. (Bryan Dep. at 53; Roberts Dep. at 85-86). But Roberts' secretary included in the newsletter the Social Security numbers of every staff member at Madison. (Bryan Dep. at 53-54; Roberts Dep. at 85-86). The newsletter's were delivered to the post office for mailing prior to Roberts proofing them, but Roberts retrieved before the post office mailed them. (Roberts Dep. at 85-87). Needless to say, the faculty were upset that their personal information nearly made it into the public domain, and Roberts and Bryan convened an impromptu school meeting to explain the error. At a school meeting, Roberts attempted to explain how the mistake occurred, informing them that a secretary had composed the newsletter and distributed it for

mailing before it was proofed. (Roberts Dep. at 88-90). Bryan later informed her that he was disappointed that she had not taken responsibility for the newsletter. (Roberts Dep. at 88-90).

The teachers remained upset, and a week later, Bryan wrote Roberts a memorandum expressing his concern about her loss of respect with the staff members at Madison because of the newsletter incident. (Def. Ex. J. at 112). Bryan explained that Roberts had "demonstrated to [her] staff a pattern of errors due to lack of attention to details [and] . . . a pattern of not accepting responsibility for errors when brought to your attention." (Def. Ex. J. at 112). Bryan informed Roberts that her explanation of the error "further eroded the staff's confidence, trust and respect in you as their principal." (Def. Ex. J. at 113). As a result of her handling of the incident, Bryan advised Roberts that he would distribute a survey to all Madison staff to assess their opinion of Roberts as principal. (Def. Ex. J. at 113).

Bryan modeled the survey after one created by Cavenagh earlier in the spring. (Cavenagh Dep. at 76, Exs. 11-12). In Cavenagh's survey, the faculty members are asked generally whether they agree or disagree about qualities that are important for a principal to be effective. (Cavenagh Dep. at Ex. 12). In Bryan's survey, the faculty members are asked to evaluate Roberts' effectiveness or skill in the general categories listed in the survey created by Cavenagh. (Cavenagh Dep. at Ex. 11). Roberts did believe that any of the questions in the survey were biased towards African Americans or females. (Roberts. Dep. at 197). The results showed that the faculty at Madison had an extremely unfavorable opinion of Roberts. (Def. Ex. J. at 116-126). Out of 33 questions, only three times did the staff give Roberts an average rating that was neutral or slightly favorable. (Def. Ex. J. at 116). Thus in 30 questions, the staff gave Roberts an average rating that was unfavorable. (Def. Ex. J. at 116). In fact, for 10 of the 33 questions, two-thirds or more of the staff gave Roberts

11

a negative rating. (Def. Ex. J. at 116). Furthermore, approximately one-third of the staff added written negative comments about Roberts at the conclusion of the survey. (Def. Ex. J. at 117-126).

After the survey was completed, Bryan wrote to Weber and explained that the tension at Madison was higher than a year ago. (Def. Ex. J. at 114). Bryan also explained that the level of staff confidence in Roberts' ability was low. (Def. Ex. J. at 114). Shortly thereafter, Bryan discussed the results of the survey with Roberts and informed her that he believed she would be unable to reverse the staff's opinion of her. (Roberts Dep. at 137). Bryan recommended that the Board terminate Roberts. (Davenport Dep. at 46-47). The Board, however, rejected that recommendation and Bryan then recommended that the District transfer Roberts to an administrative position at the central office. (Bryan Dep. at 68-69). Sally Pentecost was appointed interim principal. (Bryan Dep. at 69-70). On January 1, 2001, Roberts was transferred to the position of Administrator of Special Projects, placing her in charge of the District's grants. (Davenport Dep. at 44-45, Roberts Dep. at Ex. I). In March 2001, the Board voted not to rehire Roberts for the 2001-2002 school year. (Def. 56.1(a) Statement ¶ 176).

## II. Analysis

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts and inferences are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing summary judgment, however, must go beyond the pleadings and set forth specific

facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. And neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat such a motion. Further a plaintiff cannot manufacture a conflict by submitting an affidavit that contradicts an earlier deposition. *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir.1999). Nor can a plaintiff defeat a motion for summary judgment in the context of employment discrimination with conjecture or speculation regarding the employer's motives. *Abioye v. Sundstrand Corp.*, 164 F.3d 364 (7th Cir. 1998).

A.    *Discrimination Claims*

Roberts alleges that the District discriminated against her in violation of Title VII because of her race and gender when it transferred her to another administrative position and when it later failed to renew her contract, effectively terminating her. A plaintiff may defeat a summary judgment motion in an employment discrimination case by using either the direct method or the indirect method. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). In order to proceed under the direct method, Roberts must have put forth evidence — either direct or circumstantial — sufficient to raise an inference that the employer's decision to take an adverse job action against her was motivated by an impermissible purpose. *Cerutti*, 349 F.3d at 1060; *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003). Here, Roberts submits no evidence and makes no argument sufficient to proceed under the direct method, and so must proceed under the more familiar burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the burden-shifting test, a plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was meeting the employer's legitimate expectations; and (4) that the employer treated similarly situated employees who are not in the protected class more favorably. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001). Once a plaintiff has established a prima facie case, the burden shifts to the employer to come forward with a legitimate, non-discriminatory reason for its actions. *Id.* at 886. If the employer meet this burden, the burden returns to the plaintiff who must show the employer's proffered reasons to be pretextual. *Id.*

Roberts' race and gender discrimination claims fail because she cannot prove that she was meeting her employer's legitimate expectations. Shortly into her first year as principal at Madison, the associate superintendent received an anonymous letter from a member of the staff complaining about Roberts. In response, Bryan came to the school to observe the interaction between Roberts and her staff and he noticed the tension at the school. At the end of her first semester as principal, Bryan explained that the tension was increasing, not decreasing and warned her that if the climate at Madison did not improve he would not be able to recommend her for continued employment. Throughout Roberts' employment at Madison, the District received complaints from faculty and staff about Roberts' performance. The district hired a conflict resolution specialist who also observed that "virtually all" of the faculty at Madison believed Roberts was not responsive to their needs and that the climate at the school made it difficult for the teachers to do their jobs. Despite these troubles, the District did give Roberts a chance to improve the climate at Madison and renewed her employment for a second year. But during her second year, Roberts lost the respect of the staff when a school newsletter included the staff's social security numbers. A survey of the staff shortly after

14

this incident revealed that they overwhelmingly felt unfavorably towards Roberts and on nearly every question rated Roberts unfavorably. In other words, Roberts failed to meet the District's expectation that she effectively lead and communicate with her staff.

Roberts offers little to rebut Defendant's evidence that she failed to develop effective leadership skills or to demonstrate that she was meeting the District's performance expectations. Instead, Roberts first quibbles with the evidence submitted by the Defendant. It is true that much of what Defendant points to—deposition testimony of Houk, Olinger, and Plourde, for example—contains statements outside the scope of these witnesses personal knowledge. It is also true that Defendant often refers to facts that are contested — such as whether Roberts knew all of the staff members' names. But the Court has ignored this evidence. The record, however, is replete with facts to demonstrate that the climate at Madison was tense and that the teachers at Madison overwhelmingly disapproved of Roberts' as a principal. Roberts offers no evidence to place these facts in dispute and cannot defeat Defendant's summary judgment motion with a self-serving conclusion that, despite the numerous complaints about her leadership that are in the record, she did meet the District's expectations. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980 (7th Cir. 2004).

Roberts next points to evidence that students at Madison continued to excel, which, she argues, shows that she was meeting the District's legitimate expectations. But the students' level of performance speaks to but one of many expectations the District may have had for her. Legitimate performance expectations are "bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of [its] workers. *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). Here the District not only expected

Roberts to maintain student performance, but also expected Roberts to effectively lead the faculty and staff at Madison and to create a climate where the faculty and staff excelled. The undisputed facts demonstrate that Roberts failed to meet this expectation.

Furthermore, even if Roberts could demonstrate that she was meeting her employer's legitimate expectations, she could not show that its reason for discharging her was pretextual. Oftentimes, consideration of legitimate expectations is tied together with an analysis of whether the employer's reasons for its actions were pretextual, and in some ways that is the case here. *See, e.g., Mateu-Anderegg v. School Dist. of Whitefish Bay*, 304 F.3d 618, 626 (7th Cir. 2002). Roberts argues among other things that she was not given sufficient support by the District, and thus her performance was unfairly assessed. It is evident from the record that the District handled Roberts' tenure as the principal at Madison poorly. The District knew that two assistant principals at Madison coveted the vacant principal's position, but selected Roberts to fill that position. At the outset of her employment, Roberts complained to the District that some of the teachers appeared to launch a vendetta against her. Roberts repeated this complaint several times throughout her tenure at Madison. But the District never responded. When Bryan came to visit Madison, he focused on Roberts' conduct and never once appeared concerned with the possibility that the complaints from the faculty and staff might be a product of childishness rather than of Roberts' inability to function as a principal. In short, the District turned a blind eye to the possibility that the assistant principals might have chaffed feelings at being passed over in favor of an outsider, Roberts, and it did little or nothing to defuse the hostile situation faced by Roberts.

But the fact that the District made poor business decisions does not by itself demonstrate that its reasons for its actions were pretextual. Unless Roberts submitted evidence to show that the

16

District applied its expectations in discriminatory terms, she cannot establish that its reasons for firing her were pretextual. *See Mateu-Anderegg*, 304 F.3d at 626; *Coco*, 128 F.3d at 1179. Roberts points only to deposition testimony of one school board member, Osie Davenport, to suggest that other principals were treated more favorably and thus the District applied its expectations in a discriminatory manner. But Davenport's testimony is so vague and devoid of detail that it fails to describe the situations these principals found themselves in. In other words, Davenport's testimony does not point to another principal who, faced with overwhelming negative reactions from the staff he led, was given special services or support by the District to improve his relationships with staff. In the end, the question for the Court is not whether the District was mistaken about the reasons why the faculty at Madison consistently complained about Roberts for two years, but whether the District honestly believed that the faculty had legitimate complaints about Roberts that were sufficiently significant to prevent Roberts from doing her job. *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004).

Roberts submitted no evidence that the District did not honestly believe the teachers' complaints about her leadership. Roberts speculates that because she was the first female, African American principal in the District, because the District had only a small African American population, and because no formal grievances were filed against her that the District's reasons for terminating her must be pretextual. But neither the fact that Roberts was the first African American principal in the District, nor the racial composition of the school sheds any light on the honesty of the Defendant's motives. And the mere fact that no faculty filed formal grievances against her does not undermine the Defendant's decision to terminate her because of the volume of informal complaints lodged against her. Roberts must do more than offer her speculation regarding the

Defendant's motives. *Abioye*, 164 F.3d at 368. Roberts' discrimination claims fail because she cannot show that she was meeting her employer's legitimate expectations and because she cannot show that her employer's proffered reason for terminating her was pretextual.

B. *Retaliation Claim*

Roberts' second claim is that the district retaliated against her because she complained during the March 16, 2000 meeting with Bryan, Weber, and Davenport that she was being subjected to differential treatment because of her race and gender. As with discrimination claims, a plaintiff pursuing a retaliation claim can proceed under the direct or indirect method. Under the direct method, Roberts must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002). The Seventh Circuit has adopted a burden-shifting method, similar to that set forth in *McDonnell-Douglas*, for plaintiffs who choose to proceed under the indirect method. Under this method, Roberts must first establish that: (1) she engaged in a statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 728. (7th Cir. 2003). Once a plaintiff has established a *prima facie* case under the indirect method, the defendant has the opportunity to come forward with a legitimate reason for its action, and if it does, the burden then returns to plaintiff to show this reason to be pretextual. *Id.* Roberts cannot prevail under the indirect method because, as noted in the discussion of her discrimination claims, she cannot establish that she was meeting her employer's legitimate expectations or that the District's reasons for its actions were pretextual.

Instead, Roberts argues that her discharge took place on the heels of her statutorily protected activity, and thus a causal nexus under the direct method has been established.[3] On March 16, 2000, Roberts complained to Bryan, Weber, and Davenport that she believed her race played a part in the negative feelings demonstrated by the teachers to that point. At the outset of this meeting, Bryan and Weber had been prepared to recommend that the Board elect not to renew Roberts' contract for the upcoming school year. But as a result of the meeting, Weber and Bryan agreed to withdraw this recommendation, and in fact Roberts was given another chance to rectify the problems between herself and the staff at Madison. Rather than retaliate against Roberts, the District instead provided her a second-year's contract. It was not until the problems persisted throughout Roberts' second year that the District elected to decline to renew Roberts' contract for the 2001-2002 school year. Indeed, more than a year passed between Roberts' statutorily protected activity and the Board's decision to terminate her employment. The Court concludes that Roberts has failed to submit any evidence, direct or circumstantial, to demonstrate that there was a causal nexus between her March 16, 2000 complaints and her March 2001 termination and her retaliation claim fails.

## C.    Due Process Claim

Roberts' final claim is that the District deprived her of due process when it discharged her without notice of the charges against her or a fair and prompt hearing. In its motion for summary judgment, the Defendant mistakes Roberts' due process claim as a 42 U.S.C. § 1983 equal protection

---

[3] Roberts' argument is confusing. At the conclusion of the single paragraph in her brief, Roberts states that "Jones made his first complaint of race discrimination in 1995 . . . [and the] proximity of time establishes the causal nexus." Of course, Roberts (and not Jones) is the Plaintiff in this case and Roberts was not hired until 1999. The Court construes Roberts' argument liberally to suggest that the proximity between her complaints at the March 16, 2000 meeting and the Board's March 2001 decision to terminate her employment demonstrates a causal nexus.

claim. Roberts moves to strike the District's motion for summary judgment on Count III of her complaint. In response to Roberts' motion to strike, the District points out the grounds for its summary judgment motion as to Count III of Roberts' complaint. Because the undisputed facts show that Roberts cannot state a due process claim, the District's motion for summary judgment as to Count III is also granted.

In order to assert a violation of the due process clause in the context of an employment decision, a plaintiff must show that she had a property interest and that the deprivation of continued employment occurred without due process of law. *Burrell v. City of Mattoon*, 378 F.3d 642, 647 (7th Cir. 2004). "'A protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract--those 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004) (quoting *Johnson v. City of Fort Wayne*, 91 F.3d 922, 943 (7th Cir.1996)) (internal quotation omitted).

Here there is no state statute, regulation, or school code that provides Roberts with any expectation that her job as principal should continue beyond the length of any contract. Further, Roberts points to no evidence to suggest that any conduct on the part of the District created a legitimate claim of entitlement to an extension of her contract beyond the 2000-2001 school year. Indeed, quite to the contrary, every message that Roberts received from the District during the 2000-2001 school year informed her that she was not performing her job to the District's satisfaction and that it was unlikely that it would renew her contract. Because Roberts can not demonstrate a legitimate claim to continued employment, her due process claim fails.

### III. Conclusion

It seems likely that the Defendant handled Roberts' tenure as school principal poorly. The conflict resolution specialist it hired recognized the District put Roberts into a difficult position because of the feelings of the assistant principal who had also applied for Roberts' principal position. Even the District's own school board member recognized that Roberts had been placed in a difficult position. And yet the District did little to defuse the tense situation. Instead, the District appears to have allowed childishness and pettiness prevail over the students' well-being, which is unfortunate. But as unfortunate as the District's poor business decisions may have been, they do not amount to discrimination and Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED

11/1/04
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler
United States District Court